1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KEVIN PISHA,

Plaintiff,

v.

SAFECO INSURANCE COMPANY OF
AMERICA,

Defendant.

CASE NO. C17-5791 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendant Safeco Insurance Company of

America's ("Safeco") motion for summary judgment. Dkt. 32. The Court has considered

the pleadings filed in support of and in opposition to the motion and the remainder of the

file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I.   PROCEDURAL HISTORY

On October 2, 2017, Plaintiff Kevin Pisha ("Pisha") filed suit against Safeco

alleging breach of contract, violation of the Insurance Fair Conduct Act, RCW 48.30.015

("IFCA"), bad faith, and violation of the Unfair Business Practices – Consumer

Protection Act, RCW Chapter 19.86 ("CPA"). Dkt. 1. On November 13, 2019, Safeco

1    moved for summary judgment. Dkt. 32.[1] On November 22, 2019, Safeco filed an

2    amended motion for summary judgment. Dkt. 35-1. On December 30, 2019, Pisha

3    responded. Dkt. 42. On January 10, 2020, Safeco replied. Dkt. 52.

## II.   FACTUAL BACKGROUND

5        In the fall of 2014, Pisha bought a 2,900 square-foot home on Lake St. Clair in

6    Olympia, Washington. Dkt. 44, ¶ 2. He intended use the home to entertain his family and

7    for his retirement. *Id*. ¶ 3. Pisha insured the home through Safeco. *Id*. ¶ 6. The home

8    burned down a month after purchase. *Id*. ¶ 12. The fire destroyed a substantial amount of

9    Pisha's personal property. *Id*. ¶¶ 36–38.

10       The property featured a cabin in addition to the home. *Id*. ¶ 44. At some point

11   following the fire, the cabin was vandalized. *Id*.

12       Pisha filed claims with Safeco for all of these losses. The parties dispute whether

13   Safeco met its obligations under the policy and under Washington law in responding to

14   the claims.

15       As the timeline is complex, the Court will first set out the facts relevant to the fire,

16   which are relevant to Pisha's claims about repair and replacement of his home under the

17   policy's dwelling coverage and relevant to his claims under the policy's personal

18   property coverage, and then set out the facts relevant to the vandalism of the cabin.

---

[1] In the intervening period, the parties twice stipulated to continue trial and related deadlines. *See* Dkts. 27, 30.

1

## A.     The Fire

2       Pisha declares that he purchased the house after foreclosure for cash on October 3,

3   2014, and because of these sale circumstances, he purchased without an inspection. Dkt.

4   44, ⁋⁋ 2, 5. On October 8, 2014, he purchased homeowner's insurance from Safeco

5   through agent Rachel Erben ("Erben") at brokerage Nicholson & Associates LLC

6   ("Nicholson"). *Id.* ⁋ 6. Brandon Thompson ("Thompson"), the owner of a local

7   construction company, declares that he visited the property in the second week of

8   October following Pisha's request for assistance with the septic system. Dkt. 46, ⁋⁋ 2–4.

9   Thompson declares that he saw extension cords attached to heaters and Pisha told him

10  that the home had electrical problems and that he was working to locate an electrician. *Id.*

11  ⁋ 4. Pisha declares he had scheduled an electrician to come during the first week of

12  November 2014. Dkt. 44, ⁋⁋ 9–10.

13      In late October 2014, Pisha and his then-girlfriend Mary Ness ("Ness") were

14  travelling in eastern Washington. *Id.* ⁋ 11.[2] On October 31, 2014, while at a hotel in

15  Leavenworth, Washington, Pisha received a phone call from a neighbor informing him

16  the house was on fire. *Id.* ⁋ 12. He drove back home, found the fire department had

17  extinguished the fire, and examined the damage. *Id.* ⁋⁋ 12–13. A representative of

18  Casualty Loss Consultants ("CLC") arrived and informed Pisha that it could handle all

19  aspects of an insurance claim, would notify Safeco, and that he should not contact Safeco

20  directly. *Id.* ⁋⁋ 13–14, 16. Pisha signed a contract with CLC on November 1, 2014. *Id.* ⁋

21  _____

22          [2] Pisha declares that he and Ness ended their relationship shortly after the fire. *Id.*

14. On November 3, 2014, Pisha left Erben a voicemail to ensure she was aware of the fire. *Id*. ⁋ 15; Dkt. 35-3, Ex. 4 at 71.[3] On November 4, 2014, Safeco sent Pisha a notice that it would cancel his policy effective December 23, 2014 due to "[t]he wind damage loss on 9/30/2013." Dkt. 35-3, Ex. 1 at 3. Safeco's internal records also show concerns about maintenance issues with the cabin, specifically peeling paint on the eaves and moss on the roof. Dkt. 43-14, Ex. N. at 12.

On November 5, 2014, Jack D. Thomas ("Thomas") of CLC notified Safeco that CLC would be representing Pisha as public adjusters regarding the fire and notified Safeco of the damages claim. Dkt. 35-3, Ex. 2 at 65. On November 6, 2014, Safeco contacted CLC to gather initial information about the claim. Dkt. 35-3, Ex. 3 at 68. Also on November 6, 2014, Safeco retained Case Forensics to investigate the fire, Dkt. 35-3, Ex. 4 at 70, contacted Nicholson to request the policy application, *id*. at 71, and referred the claim to its Special Investigation Unit ("SIU"), *id.*, Ex. 5 at 73. Steve Gunsolley ("Gunsolley") was the Case Forensics cause and origin ("C&O") investigator. Dkt. 49 at 14.[4]

Safeco adjuster Chris Pratt ("Pratt") identified and testified to four issues that raised concerns about the claim and together supported referring it to SIU: (1) that the loss occurred on a new policy, (2) that the loss occurred on newly purchased property, (3) that the report was delayed (the fire occurred October 31, CLC was retained on

---

[3] ECF pagination cited unless otherwise indicated.

[4] For Dkt. 49, the Court cites the deposition transcript pagination.

1  November 1, Nicholson was notified of the fire November 3, and CLC reported the fire

2  November 5), and (4) the unreported claim from another home which caused the

3  November 4, 2014 policy cancellation notice. Dkt. 35-3, Ex. 5 at 73; Dkt. 48 at 9, 14.

4  Greg Rohall was the SIU investigator assigned. Dkt. 48 at 15. Pratt testified that referral

5  for C&O investigation is standard procedure for large fire losses and is decided

6  separately from SIU referral. *Id.* at 6, 7.

7         On November 10 and 13, 2014, Gunsolley examined the site, took photos, and

8  noted suspicious burn marks on the electrical service panel in the home's basement. Dkt.

9  49 at 24. Gunsolley had asked Ivan Van De Wege ("Van De Wege"), an electrical

10  engineer for Case Forensics, to assist him with the investigation. Dkt. 47 at 15.[5]

11  Gunsolley testified that based on his initial work, he was suspicious about the fire but

12  "still had a long way to go before I was going to make any determinations." *Id.* at 25.

13         Pisha declares that a few weeks after the fire he noticed a section of wall in the

14  basement containing the electrical panel had been removed. Dkt. 44, ⁋ 17. Gunsolley

15  testified that he had removed a portion of the wall as part of his investigation, including

16  the area above and to the right of the panel where he determined the fire had originated.

17  Dkt. 49 at 37–40. Gunsolley testified that there were no suspicious burn patterns at the

18  point of origin and testified that he identified the point of origin by approximately

19  November 17, 2014. *Id.* at 40, 63.

20

21

22         [5] Deposition transcript pagination.

1     On November 14, 2014, Pratt spoke with Case Forensics about their investigation.

2     Dkt. 35-3, Ex. 8 at 80–81. Pratt's notes summarize the conversation as follows: "[c]an't

3     explain the fire at this point in time. No type of pour to test, the critical item is the wall,

4     and the burn patterns, and how it all fits together." *Id.* at 81. On November 17, 2014,

5     Safeco's SIU called Thomas to let him know Safeco would be requesting an examination

6     under oath ("EUO") of Pisha. Dkt. 35-3, Ex. 9 at 83; *see also* Dkt. 35-3, Ex. 10 at 85–86.

7     Gunsolley testified that he was not part of this decision and did not remember suggesting

8     questions, which he had done occasionally in other cases in the past. Dkt. 49 at 71–72.

9     On December 3, 2014, SIU contacted Pisha's ex-wife, who "suggested it would be

10    prudent to look at the fire very carefully." Dkt. 35-4, Ex. 11 at 2.

11    On December 3, 2014, Safeco estimator Diane L. Starling ("Starling") completed

12    an estimate for the cost of covered repairs to the home. Dkt. 35-5, Ex. 25 at 17. On

13    January 27, 2015 Thomas emailed Pratt saying that Thomas's engineer determined there

14    was no fire damage to the walls, so Thomas would have to revise his estimate, Dkt. 35-5,

15    Ex. 26 at 40.

16    On December 5, 2014, attorney Daniel E. Thenell ("Thenell") wrote to Pisha

17    informing him that Safeco was requesting an EUO on December 17, 2014 and requested

18    substantial documentation by December 12, 2014 (including proof of ownership for all

19    items damaged in the fire, all phone records, credit cards, and bank records for October 1,

20    2014 to November 30, 2014, and all documents establishing Pisha's whereabouts the

21    night of the fire). Dkt. 35-4, Ex. 12 at 6–7. Thomas declares that based on his previous

22    experience with Thenell, he requested Safeco use a different attorney, which Safeco

ORDER - 6

1   declined to do. Dkt. 45, ¶ 11.  On December 11, 2014, Thomas emailed Pratt informing

2   him that Thomas had hired an inventory company to prepare Pisha's personal property

3   claim, argued the request for an EUO was premature, and informed Pratt that Thomas had

4   referred Pisha to counsel. Dkt. 35-4, Ex. 13 at 10. Following scheduling discussions

5   between Thenell and Pisha's counsel Spencer Freeman ("Freeman"), Safeco agreed to

6   reset the EUO sometime before January 9, 2015. Dkt. 35-4, Exs. 14–15. Pratt testified

7   that in the time frame the EUO was requested, Safeco did not know the amount of the

8   claim but understood it to be significant. Dkt. 48 at 45. Pratt also testified that he thought

9   Safeco would have still requested an EUO even if suspicious burn marks had not been

10   identified, in order to investigate the issues leading to referral to SIU. *Id*. at 56–57.

11        On December 19, 2014, Pisha met with Gunsolley. Dkt. 44, ¶ 18. Freeman had

12   suggested to Thenell that this interview take place before the EUO. Dkt. 35-4, Ex. 15 at

13   17. Gunsolley testified that his questions for Pisha were primarily about electrical issues,

14   which Pisha answered. Dkt. 49 at 27.

15        Pisha declares that the EUO had to be continued due to his unavailability and due

16   the time it would take to gather the documents Safeco requested. *Id*. ¶ 19. Freeman and

17   Thenell attempted to schedule the EUO between the end of December 2014 and May

18   2015, including Thenell's requests for proposed dates on February 26, 2015 and April 23,

19   2015, and Freeman's response on May 7, 2015. Dkt. 35-4, Exs. 16–22. Pisha declares

20   that he offered to appear for an in-person recorded statement instead of an EUO, which

21

22

1    Safeco declined. Dkt. 44, ⁋ 20.[6] He declares that "[i]t was clear that based upon the

2    removal of the wall of my home and all the documents that were being requested that

3    Safeco was investigating me on a suspicion that I burned my home." *Id*. ⁋ 21. Pisha

4    declares that Thomas confirmed these concerns and that Pisha was greatly upset to be

5    under suspicion. *Id*.

6         On April 20, 2015, Thomas submitted Pisha's dwelling claim with proof of loss.

7    Dkt. 35-5, Ex. 27 at 42–43. The claim estimated the replacement cost of repairs at

8    $285,426.36 and the Actual Cash Value ("ACV") at $243,962.00 and included certain

9    open items. *Id*. at 45.[7] On May 1, 2015, Safeco acknowledged receipt stating that it still

10   needed to complete the EUO, needed Pisha's proof of loss for personal property, and

11   needed the documentation Thenell had requested for the EUO. Dkt. 35-5, Ex. 28 at 47.

12        On May 26, 2015, Ness told Safeco's call center "everything in the home was

13   hers, and that Mr. Pisha started the fire." Dkt. 35-4, Ex. 11 at 3. Ness told Pratt "this is

14   not the first fire Mr. Pisha has been involved with . . . ." *Id*.

15        The EUO began on June 4, 2015, conducted by Thenell. Dkt. 44, ⁋ 22; Dkt. 35-5,

16   Ex. 24 at 13–14. Pisha declares that when asked about his report of no previous losses on

17   his application, he explained that he and his agent had not listed the claim from his

18

19        [6] Pratt testified that as an office-based employee, he did not have the equipment necessary to
     conduct recorded statements in person. Dkt. 48 at 68.

20        [7] The claim also included an engineering report dated March 3, 2015, stating that due to
     "evidence of excessive cracking of the CMU mortar joints in the upper level walls," repair efforts should
21   "2. Remove all upper CMU walls . . . 5. During the demo process, the remaining CMU walls can be
     verified for reinforcing steel, grout, and overall structural soundness. In absence of reinforcing steel and
     grout, the remaining ground level CMU walls could be up-graded to current code standards." Dkt. 45 at
22   17.

1    previous house because they understood the question to be specific to the new house.

2    Dkt. 44, ⁋ 23. At the end of the EUO, he was notified that Safeco had terminated his

3    policy due to the prior unreported claim, notice he had not previously received. *Id.* ⁋ 24.

4    Pisha declares that the delayed fire investigation, the demand for the EUO, the demand

5    for documentation, and the questioning led him to believe that Safeco was trying to set

6    him up to deny his claim and pressure him with arson allegations, which caused him

7    significant anxiety and health problems. *Id.* ⁋ 25. Pisha produced documents at the EUO

8    in support of his personal property claim, so the EUO continued on June 23, 2015. Dkt.

9    35-5, Ex. 29 at 50.

10          On August 10, 2015, Thenell informed Freeman that Safeco could not finalize a

11   coverage determination because it was awaiting a complete proof of loss and updated

12   inventory, awaiting clarification of Pisha's marital status, and awaiting Pisha's signature

13   on the EUO transcripts. Dkt. 35-5, Ex. 30 at 54–55. On September 3, 2015, Thenell wrote

14   to Freeman providing additional information about the timing of Safeco's process,

15   including that Safeco anticipated "the expert analysis of the subject fire loss to conclude

16   within two to three weeks." *Id.* at 56–58. Van De Wege testified that he did not examine

17   the fire evidence between the time it was removed from the home and August 2015. Dkt.

18   47 at 58. He testified that though a staple in a wire was discovered in August 2015, his

19   team could have proceeded with its lab exam in December of 2014 and discovered the

20   staple then. Dkt. 47 at 77, 89. Van De Wege testified that he could not rule out the staple

21   as the cause of the fire, but in his mind the cause was still undetermined because the

22   staple was "a very bad ignition source." *Id.* at 82.  He also testified that at the end of

1    December 2014, he thought the investigation was in "a hold state until we were given any

2    further direction from Safeco." *Id.* at 103. Gunsolly testified that he did not know why

3    Case Forensics paused work on the case between January 2015 and late July 2015. Dkt.

4    49 at 29.

5            On September 9, 2015, Gunsolley told Safeco's SIU that he had no explanation for

6    the burn pattern he observed on the wall and multiple engineers had looked at it and

7    could not explain it, "[h]owever, when then [sic] took the portion of the wall out and

8    examined it at the lab, with Mr. Van Dewege in attendance, they did find one staple

9    through an electrical wire behind the panel." Dkt. 36-6, Ex. 30 at 3. SIU requested a

10   detailed report "with his findings, why the additional testing was performed and the

11   reason for the length of the origin and cause investigation." *Id.* Gunsolley testified that he

12   did not draft or work on a final report. Dkt. 49 at 101. Gunsolley testified that the fire

13   originated in "[i]ntercostal space above the service panel" (meaning the space between

14   two floors of the home) and there were unusual burn patterns on the service panel but the

15   burn patterns did not necessarily equate to where the fire started. Dkt. 49 at 34–35, 55.

16           On September 16, 2015, Safeco accepted coverage for Pisha's claim for fire

17   damage to the home. Dkt. 44, ¶ 26; Dkt. 35-6, Ex. 33 at 7. On October 9, 2015, Safeco

18   issued a check for the actual cash value of the structural damage. Dkt. 35-6, Ex. 34 at 9.

19           Thomas initially provided a personal property inventory on September 24, 2015,

20   Dkt. 35-7, Ex. 46 at 17, but updated Pratt on October 14, 2015 that the inventory was not

21   complete and required additional information from Pisha, Dkt. 35-7, Ex. 47 at 19.

22   Thomas also informed Pratt that the delay was in part due to Pisha's mental health,

explaining that Pisha was "under the care of a physiologist and his mental issues have been attributed to stress from the treatment he has received from your company on this claim as well as the way he has been treated by his auto insurer American Family. He indicates the treatment by your attorney in the EUO's has been a primary source of his mental issues." Dkt. 35-7, Ex. 47 at 19.

On October 21, 2015, Pisha's personal property claim was submitted, having been prepared by CDR, Inc. ("CDR"), a company retained by CLC, for $168,631.03 replacement value, and $129,345.05 ACV. Dkt. 44, ¶¶ 36–27; Dkt. 45, ¶ 26. CDR updated the claim in December 2015, revising the replacement value to $184,038.04 and the ACV to $141,520.09. Dkt. 44, ¶ 38; Dkt. 45, ¶ 28. Pisha declares that Safeco responded with a lower amount based on depreciation that conflicted with the condition information he had submitted. Dkt. 44, ¶ 39, possibly referring to a December 14, 2015 letter from Pratt which stated that Safeco's review of the property had been completed, Safeco had sent a check for $112,309.92 payable to Pisha, Ness, and CLC, and explaining that Safeco had accepted the majority of the prices on the inventory. Dkt. 35-7, Ex. 49 at 24–24. The letter listed "Recoverable Depreciation" at $45,704.46 and explained that "[i]n your policy provisions, you have **180 days from the date of loss** in order to recover the depreciation on contents under the replacement cost extension of coverage. **Due to the amount of time required to complete the coverage investigation, this timeframe has been extended to 180 days from the date of this letter.**" *Id*. at 25. It further explained that Pisha could submit receipts for the contents items on or before June 14, 2016 "in order to recover the depreciation withheld." *Id*.

On January 28, 2016, Starling informed Pratt she was waiting to speak to Thomas to finish negotiating repairs. Dkt. 35-6, Ex. 36 at 52. Starling also reached out to Thomas in February and March 2016. *Id*. at 53–56. On March 23, 2016, Thomas emailed Pratt saying he had reached agreement with Starling "on her revised estimate of around $211K on the dwelling," but noting that the concrete masonry unit ("CMU") block walls "are open," "will be an issue to be determined during demolition," and "could be a substantial amount." Dkt. 35-6, Ex. 37 at 59. Thomas asked Pratt to issue the ACV payment "and a letter stating the RC and ACV amounts and that there are open items and the RC holdback will be paid when the Insured meets the RC provisions of the policy." *Id*.

Thomas declares that in March 2016, he and Starling "came to an agreement on the dwelling claim with the *express* understanding that the CMU block replacement was an open item, among many, on the dwelling claim." Dkt. 45, ⁋ 20. He declares that it was "expressly understood that the CMU block may be paid under the dwelling coverage." *Id*.

On March 30, 2016, Starling sent Thomas a letter stating that Safeco and the contractor agreed known repairs can be completed for $211.470.15 "plus the stated open items within the estimate subject to incurred invoiced as well as unseen fire related damages which may expand the scope of repairs . . . ." Dkt. 35-6, Ex. 37 at 61. The letter stated the parties agreed October 30, 2016 was a reasonable repair completion deadline, confirmed that $122,382 had been paid to date as ACV and confirmed that Safeco agreed to pay "up to the Replacement Cost as noted above plus the open items subject to the terms and conditions of the policy." *Id*. On April 8, 2016, Pratt sent Thomas a letter confirming a supplemental ACV payment of $25,530.94. Dkt. 35-6, Ex. 38 at 64.

On November 9, 2016, Thomas sent Pratt an estimate of $94,622.68 for the CMU block walls and foundation "which were damaged in the fire in specific areas," explaining that "[t]he complete replacement, however, is in compliance with the local Building Authority to bring the entire structure to current code requirements." Dkt. 35-6, Ex. 38 at 67.

Thomas also included Pisha's handwritten answers to questions from Safeco regarding the personal property claim, correcting values Pisha had missed when reviewing the inventory CDR prepared. Dkt. 35-6, Ex. 38 at 67; Dkt. 44 ¶¶ 40–41. Pisha declares that along with submitting handwritten corrections, he amended his claim, requested that Safeco explain its increased depreciation, and requested additional ACV of approximately $24,210.17. Dkt. 44, ¶ 41. Thomas declares that Safeco's response "failed to provide explanation for the increased depreciation, only to state essentially that it was based upon the category of item and age. In short, there was no consideration for the actual condition of an item and no explanation why Mr. Pisha's asserted condition of the item was rejected." Dkt. 45, ¶ 32.  Pratt testified that he had asked for Pisha to provide additional information on the condition of items and in response, Pisha submitted an inventory with changed ages "which is not what we asked for." Dkt. 53-3 at 4.

On February 8, 2017, Safeco representative J. Greg Crump ("Crump"), who replaced Starling when she retired, Dkt. 48 at 64–65, sent Thomas a letter "confirm[ing] agreed costs" for the agreement reached between Safeco and CLC in March 2016, stating that "[b]oth parties agreed repairs due to the claim, [sic] can be completed for $211,470.15. in addition to this agreed upon amount, we now know the costs of items

1    that are required by ordinance and law," Dkt. 35-6, Ex. 40 at 69. The letter stated that

2    Safeco had paid the ACV amount, had agreed to pay up to the replacement cost amount,

3    and also agreed to pay the ordinance and law amount of $72,000.00 after it has been

4    incurred. *Id*.[8] Thomas declares that Crump "fail[ed] to recognize or acknowledge that the

5    dwelling claim was not fully settled, but had express open items including the CMU

6    block." Dkt. 45, ⟨ 22. Thomas declares that Crump's February 8 letter "omits

7    acknowledgement of the open items (CMU block)" and declares that "I needed Safeco to

8    acknowledge that a portion of the CMU block not visibly damaged by the fire would be

9    covered for replacement under the dwelling coverage, not the code coverage, as was

10   agreed by Ms. Starling. Mr. Crump did not do so, but in February 2017 asserted that the

11   CMU block was covered only under the code upgrade coverage." *Id*. ⟨⟨ 23–24. Pisha

12   declares that though Safeco paid him the ACV, he "could not enter into a contract with a

13   contract to rebuild until we had resolved the CMU block issue." Dkt. 44, ⟨ 32.

14          In February 2017 when Pisha appeared for an EUO on the vandalism claim, he

15   was informed that the EUO would also cover his updated personal property claim. Dkt.

16   44, ⟨ 42. As addressed in more detail below, this EUO ended quickly when Pisha

17   suffered an anxiety attack. *Id.* ⟨⟨ 60–61. In the summer of 2017, he was informed that

18   Safeco was denying any further payment on the personal property due to the stopped

19   EUO and would not accommodate another method of cooperation. *Id*. ⟨⟨ 43, 62, 63.

20

21          [8] The letter states that the policy caps ordinance and law coverage at $72,000. Dkt. 35-6, Ex. 40 at
     69. Pisha and Thomas both declare that the policy capped code upgrade coverage at $75,000. Dkt. 44, ⟨

22   30; Dkt. 45, ⟨ 18.

1    **B.   The Vandalism**

2           Pisha declares that in late November or early December 2014, he discovered

3    damage to the interior walls and torn out electrical wiring of his cabin. Dkt. 44, ⁋ 44. He

4    declares that he informed Erben at Nicholson "on about December 3, 2014," and

5    "believed Safeco would be informed from there, as she told me so." *Id*. ⁋ 45. He declares

6    that he also informed Thomas, but Thomas told him "that while I was being investigated

7    for arson, I should not yet submit a formal claim for the vandalism." *Id*. Thompson, the

8    construction company owner, declares that he stopped by the property in early December

9    2014 to check on Pisha. Dkt. 46, ⁋ 6. When Thompson arrived, Pisha "was down by the

10   cabin at the property." *Id*. ⁋ 7. They looked at the cabin and Thompson "saw that it was

11   really damaged by vandalism, including damaged walls and torn out electrical wiring."

12   *Id*. As noted, Safeco had cancelled the policy effective December 23, 2014. Dkt. 35-3,

13   Ex. 1 at 3. Pisha declares that during the June 2015 EUO, he "mentioned that squatters

14   were living on the property, mentioning evidence of that including evidence at the cabin"

15   and "believed that Safeco had been informed of the vandalism damage and would ask me

16   specific questions if they wanted." Dkt. 44 ⁋ 47.

17          In summer 2016, Pisha needed a place to live as the dwelling claim had not yet

18   been resolved, so he declares that he asked Thomas about getting the cabin fixed so he

19   could live there. *Id*. ⁋ 50. On July 11, 2016, Thomas emailed Pratt in part:

20          The contractor has also notified me that the second house on the property
            has been severely damaged by vandalism. I have not had the chance to go
21          inspect but he says all the wiring has been pulled out and the entire interior
            gutted. The sheetrock in every room has been destroyed. The insured is
22          currently in the Philippines involved in something to do with the Wounded

1   Warrior Project. I assume however he will be submitting a claim for the
    second dwelling as a separate loss. I think your company will want to
2   inspect this as the damages sound very substantial.

3   Dkt. 35-8, Ex. 52 at 4.[9]

4           On October 20, 2016, Pratt asked Thomas when Pisha could be available for a

5   recorded telephone statement on the vandalism issue, and Thomas replied that he would

6   set it up. Dkt. 35-8, Ex. 54 at 10. On November 7, 2016, Pratt sent Pisha a letter stating

7   Safeco had received his vandalism claim but needed a recorded statement before it could

8   complete its investigation and confirm or deny coverage. Dkt. 35-8, Ex. 56 at 14. The

9   letter quoted the policy's provision on the insured's duties after loss, to "cooperate with

10  us in the investigation, settlement or defense of any claim or suit." *Id*.

11          On November 9, 2016, Thomas sent Pratt a letter submitting the formal vandalism

12  claim which listed the date of discovery as December 3, 2014. Dkt. 35-8, Ex. 51 at 2. On

13  November 14, 2016, Thomas emailed Pratt stating that he had an estimate for the cabin

14  but was waiting for a Safeco claim number to be assigned. Dkt. 35-8, Ex. 55 at 12.

15  Thomas also explained that Freeman had advised Pisha against a telephone recorded

16  statement and requested that the statement take place in person that week. *Id*. On

17  December 7, 2016, Pratt sent Thomas a letter providing the claim number for the

18  vandalism and asking Thomas to contact SIU to schedule a meeting to obtain Pisha's

19  statement. *Id*. at 17.

20

21          [9] Thomas also detailed his contentious history with Thenell and described Thenell's current threat
    to sue Thomas over statements Thomas provided Safeco from Ness's family members regarding a bribe
22  Thenell allegedly offered Ness to testify against Pisha. *Id*. at 4–5.

1    On December 20, 2016, SIU reviewed police reports from Pisha's address, noting

2    that Pisha noted no damage to the home on January 14, 2016 and a lot of damage on

3    February 13, 2016. Dkt. 35-8, Ex. 57 at 21. Pisha declares that in February 2016, he

4    called the police to report his belief that Ness "had been stealing things out of the burned

5    house and had been possibly living there." Dkt. 44, ⁋ 48. As evidence of her presence, he

6    told police about graffiti in the cabin which had not been there in January 2016. *Id.* He

7    declares that the police report which states he told the officer the cabin was undamaged

8    prior to January 2016 represents a misunderstanding by an officer who "did not appear at

9    or investigate the cabin at all." *Id*. ⁋ 49.

10    On December 22, 2016, Thenell sent Pisha a letter requesting an EUO on January

11    23, 2017. Dkt. 35-8, Ex. 58 at 23. Pisha declares that this was Safeco's response to his

12    request for an in-person recorded statement with a Safeco adjuster. Dkt. 44, ⁋⁋ 52–54.

13    Pisha declares that he requested through Thomas that Thenell be replaced because

14    Thenell was involved in the arson investigation which was causing Pisha great anxiety

15    and because he believed Thenell was "out to set [him] up for something." *Id*. ⁋⁋ 54–55.

16    Pisha declares that he could not sleep, care for himself, or maintain his relationships, and

17    was placed on medication. *Id*. ⁋ 55. He declares that "[d]uring a bout of depression and

18    anxiety, in text messages to [Thomas], I expressed a desire to harm myself. I am aware

19    that during the time Safeco was demanding an EUO, [Thomas] shared these texts with

20

21

22

1    Safeco." *Id.* ¶ 56.[10] Thomas similarly declares that he forwarded Pisha's texts to Safeco.

2    Dkt. 45, ¶ 38. Pisha declares that when Safeco continued to demand an EUO conducted

3    by Thenell, he agreed in order to preserve his claim and do his best to cooperate. Dkt. 44,

4    ¶ 57–58.

5            On February 6, 2017, Thomas emailed Pratt asking him to withdraw the EUO in

6    favor of a recorded statement with Safeco's SIU. Dkt. 35-8, Ex. 53 at 7. Thomas stated

7    that he was forwarding an email from Pisha's daughter, argued that the property had sat

8    vacant during Thenell's "fishing expedition" and explained that:

9           Kevin did not know anything about the cabin until I told him. He did not
            inspect the property while it sat vacant all those months. Further, all the
10          damage is inside the cabin and nobody looked in there until Kevin
            mentioned moving to the cabin while the new house was being built. He
11          asked the contractor to look at it and give him an estimate to clean it up so
            he could live in it in a few months. The contractor looked at it and informed
12          me that the entire interior had been destroyed.

13   *Id.*[11] Thomas further explained that Pisha's neighbors were threatening suit because the

14   houses were attracting rats, that Pisha could not proceed on the primary home until "the

15   code amount issue" was resolved, and that Pisha could not repair the cabin because of

16   Thenell's delayed investigation. *Id.* Finally, Thomas stated that Thenell was continuing to

17   attempt to schedule an EUO through Freeman, stated that he thought it was clear Pisha

18   would not attend another EUO with Thenell, and explained that he would be withdrawing

19

20          [10] Pisha also declares that at an unspecified point, his mental health providers "were so concerned
     with my mental health that I was admitted to the psych ward for five (5) days for depression." Dkt. 44, ¶
     72.

21          [11] Pisha's complaint alleges that his mental health was so severely affected by this case that his
     daughter had to assist in taking care of him. Dkt. 1, ¶ 82.

22

1    from the case due to his belief that Thenell's dislike for him was impairing Pisha's

2    interests. *Id*.[12] Pratt responded citing a letter he had sent on February 2, 2017. Dkt. 35-8,

3    Ex. 59 at 28.[13] Thomas responded later that day, telling Pratt that the February 2 letter did

4    not address all of his concerns. *Id*. at 27. Thomas informed Pratt he had responded to

5    another Safeco representative's questions on the code claims that day, stated that he

6    would share Pisha's medical records with Freeman, offered a recorded statement with

7    Pisha "as a means of progressing the cabin claim but avoiding a EUO by Dan Thenell,"

8    and informed Pratt that Pisha would likely agree to an EUO with another attorney. *Id*.

9         On February 10, 2017, Thenell sent a letter to Freeman characterizing Thomas's

10    past communication to Pratt as stating that Pisha's "physical well-being is such that he is

11    unable to appear for an examination under oath," while "Mr. Thomas's more recent

12    communications, however, indicate Mr. Pisha is well enough to appear for an

13    examination under oath if Safeco were to assign a different attorney. Respectfully, Safeco

14    will not be changing counsel in this matter." Dkt. 35-8, Ex. 60 at 32.

15         The EUO took place on February 23, 2017. Dkt. 35-9, Ex. 61 at 4. Thenell began

16    by covering the claims at issue and informing Pisha that Safeco had recently requested

17    Thenell also cover some questions about the personal property related to the fire claim.

18    *Id.* at 6. Thenell then explained that Thomas had indicated Pisha's health may impair his

19

20         [12] Thomas also stated "Kevin will be represented by counsel on the remaining issues of his claims
unless you immediately move the cabin claim forward and resolve the code issue on the primary house.

21    You must also pay for the loss of use you cut off and continue the loss of use while the primary house is
being reconstructed." *Id.*

22         [13] It appears that this letter is not in the record.

1   ability to sit for the EUO and asked Pisha whether he felt medically able to proceed. *Id.* at

2   14–16. Pisha declares that when Thenell began asking questions about his mental health,

3   he experienced severe anxiety symptoms rendering him unable to continue the EUO. Dkt.

4   44, ⁋ 60. Pisha declares that his doctor later advised him that he had an anxiety attack and

5   should not continue with the EUO as it was dangerous to his health. Dkt. 44, ⁋ 61. On

6   May 30, 2017, Thenell emailed SIU stating that Freeman had informed him the EUO

7   (which had been rescheduled for June 1, 2017) could not proceed per advice from Pisha's

8   doctor which Freeman would provide and that Freeman had also informed him Pisha was

9   in the Philippines for the next several weeks. Dkt. 35-9, Ex. 62 at 20.

10          Pisha later offered to answer Safeco's questions in writing under penalty of

11   perjury, which Safeco declined. Dkt. 44, ⁋ 62. On July 7, 2017, Safeco denied the

12   vandalism claim for failure to cooperate and lack of evidence that the damage occurred

13   when the policy was active. Dkt. 35-9, Ex. 63 at 22–25; Dkt. 44, ⁋ 63. Safeco's letter to

14   Freeman denying the claim argued that when Thomas asserted Pisha was medically

15   unable to attend an EUO in January 2017, Safeco requested supporting documentation

16   which was not provided. Dkt. 35-9, Ex. 63 at 23. The letter also stated that Safeco had

17   never received the doctor's letter Freeman had indicated was forthcoming at the end of

18   May 2017 stating that Pisha should not participate in another examination under oath. *Id*.

19   at 23–24. The letter argued that Pisha had materially breached his obligation to cooperate

20   under the policy and that Safeco was prejudiced because it was unable to corroborate the

21   facts as presented without the EUO. *Id.* at 24.

22

1    Pisha declares that when Safeco's coverage of his additional living expenses under

2    the policy ran out, which had allowed him to live in another home he owned in Graham,

3    he had to sell or lease that home. Dkt. 44, ⁋⁋ 64–65. Pisha declares that he was left with

4    no choice but to devote part of the ACV Safeco had paid for his burned home to fix up

5    the vandalized cabin so he could live in it. *Id*. ⁋ 66. Pisha declares that his neighbors were

6    expressing concern about the burned home attracting rats and the County told him he had

7    to rebuild or knock the house down, so in 2017 he paid a construction company $40,000

8    to demolish the home. *Id*. at 68. He is now uncertain whether the County will allow him

9    to rebuild the home. *Id*. at 69.

## III.   DISCUSSION

11    Safeco moves for summary judgment on each of Pisha's claims. There are two

12    categories of claims at issue: claims related to the main house (the fire claims) and claims

13    related to the cabin (the vandalism claims).

**A.   Summary Judgment Standard**

15    Summary judgment is proper only if the pleadings, the discovery and disclosure

16    materials on file, and any affidavits show that there is no genuine issue as to any material

17    fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

18    The moving party is entitled to judgment as a matter of law when the nonmoving party

19    fails to make a sufficient showing on an essential element of a claim in the case on which

20    the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

21    (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

22    could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

1    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

2    present specific, significant probative evidence, not simply "some metaphysical doubt").

3    *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if

4    there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

5    jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477

6    U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

7    626, 630 (9th Cir. 1987).

8           The determination of the existence of a material fact is often a close question. The

9    Court must consider the substantive evidentiary burden that the nonmoving party must

10   meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

11   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

12   issues of controversy in favor of the nonmoving party only when the facts specifically

13   attested by that party contradict facts specifically attested by the moving party. The

14   nonmoving party may not merely state that it will discredit the moving party's evidence

15   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

16   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

17   nonspecific statements in affidavits are not sufficient, and missing facts will not be

18   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

19   **B.    Merits**

20          Pisha makes four legal claims regarding each of his insurance claims—breach of

21   contract, violation of the IFCA, bad faith, and violation of the CPA.

22

1      **1.      Breach of Contract**

2           Regarding the fire, Pisha argues Safeco breached the contract when it failed to

3      honor its promise that coverage under the dwelling portion of the policy would remain

4      open and when it failed to pay the actual cash value of his personal property. Dkt. 42 at

5      16–17.

6      **a.      Dwelling Coverage**

7           Regarding the dwelling coverage, Safeco argues that it has paid its entire

8      obligation for the actual cash value ("ACV") of damage to the home. Dkt. 35-1 at 7. It

9      argues that under the Loss Settlement clause of its policy, "the difference between the

10     ACV and the replacement cost would be owed by Safeco only once repairs were

11     completed." *Id*. Section 3 of Clause 5, Loss Settlement, provides that "[i]f the cost to

12     repair or replace is $1,000 or more, we will pay the difference between the actual cash

13     value and replacement cost only when the damaged or destroyed property is repaired or

14     replaced." Dkt. 35-3, Ex. 1 at 38. Safeco also references item 4 of Clause 5 which

15     provides "You may still make claim [sic] on a *replacement cost* basis by notifying us of

16     your intent to do so within 180 days after the date of loss," Dkt. 35-1 at 16; Dkt. 35-3, Ex.

17     1 at 39, and references district court cases holding that time limits on replacement cost

18     claims are lawful, Dkt. 35-1 at 15–16. Safeco argues that because no repairs have been

19     completed, it did not breach the policy as to the fire loss to the home. Dkt. 35-1 at 16.

20          Pisha does not dispute Safeco's payment of the ACV and does not argue that he

21     has an outstanding claim for already-incurred repair or replacement cost. Pisha sought

22     assurance from Safeco that if in the process of repairing or replacing fire-damaged CMU

1   block, it became apparent that additional CMU block was fire-damaged, or if additional

2   CMU block was necessarily damaged in repairing the fire-damaged portion, Safeco

3   would cover that cost under the dwelling portion of his policy, which had a coverage cap

4   of $360,000. Dkt. 45, ℙ 19. Thomas declares that he had an express understanding with

5   Starling that this was the case. *Id.* ℙ 20. In November 2016, Thomas submitted an

6   estimated cost of repair for the CMU block walls and foundation of $94,622.68, which

7   covered complete replacement to bring the entire structure up to current code

8   requirements. Dkt. 35-6, Ex. 38 at 67. Pisha's claim was transferred from Starling, who

9   was retiring, to Crump, in the fall of 2016. Dkt 45, ℙℙ 20–22. Thomas declares that

10   Crump "asserted that the CMU block was covered only under the code upgrade

11   coverage" which capped coverage at $75,000. *Id.* ℙℙ 18, 24. Pisha argues that Crump's

12   refusal to acknowledge Starling's previous agreement breached the contract. Dkt. 42 at

13   17.

14        In reply, Safeco argues that the change in position Pisha alleges is not reflected in

15   the cited communications between Thomas and Starling and Thomas and Crump. Dkt. 52

16   at 3–4. Safeco emphasizes that each of its adjusters deposed "agreed that their

17   understanding throughout the life of the claim was that the original ACV was subject to

18   potentially open items but that no claims for these potential open items were ever made"

19   and that Thomas's testimony that he wanted additional commitments from Safeco

20   pertained to the code upgrade claim only. Dkt. 52 at 6. Safeco quotes Pratt's testimony

21   that nothing changed from Starling's position to Crump's and that "[i]f there was an issue

22   with that, it should be brought to our attention and we'd clarify it." Dkt. 52 at 6 (quoting

1    Dkt. 53-3 at 2). In essence, Safeco argues that the evidence does not show it changed

2    position and does not show Pisha actually sought additional coverage under the dwelling

3    portion of the policy. Dkt. 52 at 6.

4    Even if the trier of fact were to find that Safeco changed its position, that change

5    in position does not breach the contract. Under the policy, Safeco agrees to pay repair or

6    replacement costs when incurred, Dkt. 35-3, Ex. 1 at 38, and otherwise, Safeco agrees to

7    pay the ACV. Even considering the implied duty of good faith and fair dealing in

8    contracts under Washington law, *Rekhter v. State, Dep't of Soc. & Health Servs.*, 180

9    Wn.2d 102, 112 (2014), the duty "requires only that the parties perform in good faith the

10    obligations imposed by their agreement," *Barrett v. Weyerhaeuser Co. Severance Pay*

11    *Plan*, 40 Wn. App. 630, 635 n.6 (Wash. Ct. App. 1985). Pisha has failed to establish that

12    it violates the duty of good faith for an insurer, while a claim is still open, to alter its

13    position regarding what coverage applies. This is especially so when uncertainty about

14    what coverage was applicable would necessarily persist until Pisha actually initiated

15    repairs and submitted a claim for reimbursement as the policy required. Thus, the Court

16    grants summary judgment on Pisha's claim for breach of contract as to the dwelling

17    coverage.

18    **b.    Personal Property Coverage**

19    "Typically, an insured that 'substantially and materially' breaches a cooperation

20    clause is contractually barred from bringing suit under the policy if the insurer can show

21    it has been actually prejudiced." *Staples v. Allstate Ins. Co.*, 176 Wn.2d 404, 410 (2013)

22    (citing Thomas V. Harris, Washington Insurance Law § 13.02 (3d ed. 2010)). The insurer

1    bears the burden to prove noncooperation. *Id.* In order to deny coverage based on an

2    insured's failure to cooperate, the insurer must show: (1) the insured failed to

3    substantially comply with the cooperation clause; (2) the requested information was

4    material to the circumstances giving rise to the insurer's liability; and (3) the insurer

5    suffered actual prejudice as a result of the insured's failure to cooperate. *Id*. at 413–19.

6            Even if an insured failed to comply with a condition of the policy before initiating

7    litigation, "an insurer cannot deprive an insured of the benefit of a purchased coverage

8    absent a showing that the insurer was actually prejudiced by the insured's noncompliance

9    with conditions precedent." *Pub. Util. Dist. No. 1 of Klickitat Cty. v. Int'l Ins. Co.*, 124

10   Wn.2d 789, 803 (1994). Actual prejudice requires "affirmative proof of an advantage lost

11   or disadvantage suffered as a result of the breach, which has an identifiable detrimental

12   effect on the insurer's ability to evaluate or present its defenses to coverage or liability."

13   *Tran v. State Farm Fire & Cas. Co.*, 136 Wn.2d 214, 228–29 (1998). "If the insurer

14   claims that it was deprived of the ability to investigate, it must show that the kind of

15   evidence that was lost would have been material to its defense." *Mut. of Enumclaw Ins.*

16   *Co. v. USF Ins. Co.*, 164 Wn.2d 411, 430 (2008). "Prejudice is an issue of fact that will

17   seldom be established as a matter of law." *Staples*, 176 Wn.2d at 419. Thus, "[p]rejudice

18   will be presumed only in 'extreme cases.'" *Id.*

19           Regarding personal property coverage, Safeco emphasize that replacement cost is

20   only owed when incurred and "[u]ntil it is replaced the insured is only entitled to receive

21   the ACV." Dkt. 35-1 at 14–15. Pisha counters that he is not seeking replacement cost but

22   instead disputes Safeco's determination of the actual cash value of his property. Dkt. 42

1    at 16. Pisha argues that Safeco paid $117,309.92 toward the actual cash value of his

2    personal property, which is $24,210.17 less than his asserted actual cash value of

3    $141,520.09. Dkt. 42 at 16. He argues the payment Safeco did make does not reflect an

4    appropriate assessment of the actual cash value claimed and argues that Safeco failed to

5    pay adjusted values based on the supplemental information he provided updating the ages

6    of items on the CDR inventory. *Id*. Pisha declares that along with his handwritten

7    corrections to the ages of items, he "requested that Safeco explain its increased

8    depreciation." Dkt. 44, ₱ 41.

9         In reply, Safeco argues that it depreciated the property "[u]sing widely accepted

10   practices that are industry standard" and appears to invoke the duty of cooperation,

11   arguing that "[w]hen plaintiff was informed that his multiple handwritten changes to

12   previously produced sworn contents inventories and the basis for CDR's calculations

13   needed further explanation, none was forthcoming." Dkt. 52 at 6–7. Safeco submitted

14   evidence that it sought further information from Pisha. As noted, Pratt testified that when

15   he asked Pisha to provide additional information on the condition of items, Pisha

16   responded with an inventory correcting the item's ages "which is not what [Safeco] asked

17   for." Dkt. 53-3 at 4.

18        Safeco attempted to seek additional information from Pisha about his personal

19   property claim at the vandalism-related EUO which was terminated and not rescheduled.

20   Pratt testified that Safeco "had reason to ask about the alterations that were being made to

21   the inventory . . . we definitely had questions that needed answers." *Id*. at 5. After being

22   medically unable to continue the EUO in February 2017, Pisha offered to provide written

1    responses to Safeco's questions under penalty of perjury, which Safeco did not accept.

2    Dkt. 44, ¶¶ 61–62. Pisha declares that in the summer of 2017, he was informed that

3    Safeco was denying any further payment on the personal property due to the stopped

4    EUO and would not accommodate another method of cooperation. *Id.* ¶¶ 43, 62, 63.

5        Pisha's handwritten changes to the inventories is evidence that the actual cash

6    value of his property is higher than what Safeco paid, and his request for Safeco to

7    explain "its increased depreciation" is evidence he disputed the original payment. While

8    Safeco argues that it needed additional information about the age and condition of Pisha's

9    property and had unanswered questions, Pisha's medical barrier to completing the EUO

10   and offer to provide written information under penalty of perjury instead is evidence that

11   he substantially complied with the investigation. Further, Safeco does not specifically

12   explain how it was prejudiced by the lack of information on age and condition of the

13   property. Therefore, the Court finds a dispute of fact as to whether Pisha failed to

14   substantially comply with Safeco's investigation of the personal property claims and as to

15   whether Safeco was prejudiced by Pisha's failure to provide the requested additional

16   information, *Pub. Util. Dist. No. 1 of Klickitat Cnty.*, 124 Wn.2d at 803–04, and denies

17   summary judgment on Pisha's claim for breach of contract as to the personal property

18   coverage.

19                 c.    **Additional Living Expenses Coverage**

20       Regarding additional living expenses, the policy provided coverage for temporary

21   housing costs for up to two years after a covered loss. Pisha does not dispute that Safeco

22   paid his expenses for a hotel stay and then for the rental value of a second home he

1  owned in Graham, Washington, covering a period from shortly after the fire through

2  November 15, 2016. *See* Dkt. 35-6, Exs. 41, 42, 43. Safeco is correct that Pisha's

3  opposition brief does not argue Safeco failed to pay benefits owed under the additional

4  living expenses provision as a breach of contract, so the Court agrees that it is undisputed

5  those benefits are not part of Pisha's breach of contract claim. *See* Dkt. 52 at 8.

6            **d.**    **Coverage for the Vandalism Claim**

7        Regarding the vandalism claim, Pisha claims Safeco breached the contract because

8  it denied the vandalism claim based on an unreasonable investigation and/or based on an

9  unreasonable conclusion that Pisha failed to cooperate in its investigation. Dkt. 42 at 17–

10  18. Safeco argues that it was justified in requesting an EUO regarding the vandalism

11  claim both under the policy and under RCW 48.18.460 and was prejudiced as a matter of

12  law when Pisha failed to cooperate and attend the EUO. Dkt. 35-1 at 17–18. Pisha does

13  not dispute that "Safeco may have valid questions about his claim." Dkt. 42 at 18.  He

14  argues that because the record shows he attempted to attend the EUO with Thenell and

15  suffered an anxiety attack and because he was willing to answer Safeco's questions

16  through (1) an in-person recorded statement, (2) an EUO with someone other than

17  Thenell, or (3) written questions with responses under oath, there is a material dispute of

18  fact as to whether he failed to cooperate and as to whether Safeco's investigation was

19  reasonable. *Id*. The Court addresses the second element of the defense of failure to

20  cooperate before turning to the first and third elements. *Staples*, 176 Wn.2d at 413–19.

21        Regarding whether the information sought was material to the circumstances

22  giving rise to the insurer's liability, Safeco is correct that the policy required the insured

1   to submit to EUOs as often as Safeco reasonably required, Dkt. 35-3 at 38, and correct

2   that an EUO on the issue of the vandalism claim's timing was material, "concerning a

3   subject reasonably relevant and germane to the insurer's investigation as it was

4   proceeding at the time it made the demand," Dkt. 35-1 at 17 (quoting *Pilgrim v. State*

5   *Farm Fire & Cas.*, 89 Wn. App. 712, 720 (Wash. Ct. App. 1997)). Safeco is also correct

6   that Pisha's lack of answers to these questions led to its denial of the vandalism claim and

7   Pisha's corresponding claims in this lawsuit. Thus, Safeco has established the second

8   element.

9         Regarding whether Pisha failed to substantially comply with the cooperation

10  clause, the record shows Safeco initially offered to conduct a telephonic recorded

11  statement, Dkt. 35-8, Ex. 54 at 10, Pisha countered with an offer to participate in an in-

12  person recorded statement, Dkt. 35-8, Ex. 55 at 12, and Safeco felt that an in-person

13  recorded statement was not feasible, Dkt. 48 at 6. After Pisha suffered an anxiety attack

14  at the vandalism-related EUO with Thenell, he declares that his medical providers

15  advised him "not to continue with the EUO as it was dangerous to my health." Dkt. 44, ¶

16  61. Pisha declares that he then offered to answer Safeco's questions through a declaration

17  under penalty of perjury. *Id.* ¶ 62. While Safeco argues "there is no evidence before this

18  Court that Safeco's use of Mr. Thenell or its exercise of its contractual and statutory right

19  to an EUO was unreasonable," Dkt. 52 at 9, the Court disagrees. Pisha's declaration and

20  evidence in the record that Freeman told Safeco Pisha had been medically advised not to

21  continue with the EUO, Dkt. 35-9, Ex. 62 at 20 (even if that medical letter was not

22  provided to Safeco, Dkt. 35-9, Ex. 63 at 23), create a dispute of fact as to whether

1    Safeco's continued insistence on an EUO was reasonable. This dispute of fact is material

2    to whether Pisha substantially complied with the policy's requirement to submit to an

3    EUO.

4           Regarding prejudice, Safeco argues that Pisha's failure to cooperate with its EUO

5    made it "impossible or [sic] Safeco to investigate or evaluate his claim that the damage

6    occurred prior to cancellation." Dkt. 35-1 at 18. While Safeco is likely correct that the

7    lack of any response from Pisha on its questions about the timing of the vandalism

8    prejudiced its ability to investigate the claim, *see Tran*, 136 Wn.2d at 230 (prejudice

9    shown when insurer had reason to question validity of claim and sought cooperation from

10   insured to determine whether it should deny or pay suspected fraudulent claim), the Court

11   finds that a material dispute of fact remains about whether Safeco could have reasonably

12   proceeded with one of Pisha's proposed alternatives to an EUO to avoid the alleged risk

13   to his health or whether Safeco could have proposed an alternative of its own. *See*

14   *Staples*, 176 Wn.2d at 419 ("Prejudice . . . will seldom be established as a matter of

15   law.") Therefore, the Court denies summary judgment as to Pisha's claim for breach of

16   contract as to the vandalism claim.

17          **2.      Violation of the IFCA**

18          Washington's IFCA allows an insured who is "unreasonably denied a claim for

19   coverage or payment of benefits by an insurer [to] bring an action in the superior court of

20   this state to recover the actual damages sustained."  Wash. Rev. Code § 48.30.015.  In

21   *Perez–Crisantos v. State Farm Fire and Casualty Co.*, 187 Wn.2d 669 (2017), the

22   Washington Supreme Court considered whether an insured can sue his insurance

1   company under IFCA for Washington regulatory violations. It held that insureds have no

2   private cause of action under IFCA against insurers for violating the Washington

3   Administrative Code ("WAC").  *Id*. at 680–83.  "The insured must show that the insurer

4   unreasonably denied a claim for coverage or that the insurer unreasonably denied

5   payment of benefits. If either or both acts are established, a claim exists under IFCA." *Id*.

6   at 683 (citing *Ainsworth v. Progressive Cas. Ins. Co.*, 180 Wn. App. 52, 79 (2014)).

7          As a threshold matter, Safeco argues that Pisha's complaint does not actually

8   allege an IFCA claim when the complaint's only mention of the IFCA is its prayer for

9   relief in the form of treble damages under IFCA. Dkt. 35-1 at 18. Pisha does not address

10  this argument. The Court declines to grant summary judgment on this basis. First, Safeco

11  does not argue it was deprived of notice that Pisha was making an IFCA claim. Second,

12  Pisha's complaint generally alleges the actions that the Court finds could support IFCA

13  claims—that Safeco failed to adjust its payment of the actual cash value of Pisha's

14  property after he provided additional information, and denied his vandalism claim after

15  Pisha attempted to cooperate with its investigation. Dkt. 1, ¶¶ 43, 45, 56, 64–70.

16         Regarding the dwelling coverage, Pisha argues that Safeco denied benefits in

17  violation of IFCA where it denied benefits under the dwelling portion of the policy. Dkt.

18  42 at 19. Safeco argues that it "has not denied, let alone unreasonably denied, any part of

19  Pisha's fire claim." Dkt. 35-1 at 18. Safeco's alleged change in position when the CMU

20  block item remained open does not represent a denial of coverage or benefits under the

21  policy. Therefore, the Court grants summary judgment on this issue.

22

1    Regarding the personal property coverage, Pisha argues that Safeco denied

2    benefits in violation of IFCA where it paid less than the actual cash value of his property.

3    Dkt. 42 at 19. Safeco argues it did not deny Pisha's personal property claim. Dkt. 35-1 at

4    18. The record reflects that Safeco's efforts to investigate the vandalism claim through an

5    EUO also incorporated an effort to investigate Pisha's dispute of the age and condition of

6    his property as relevant to depreciation. There is a material dispute of a fact as to whether

7    that investigation was reasonable. Therefore, the possible failure to investigate reasonably

8    could provide a basis to conclude Safeco unreasonably denied coverage of those claims.

9    Thus, the Court denies summary judgment as to Pisha's claim regarding Safeco's

10   handling of the actual cash value of his personal property as a violation of IFCA.

11   Regarding the vandalism claim, Pisha argues there is at minimum a dispute of fact

12   about whether Safeco's denial was reasonable, relying on his breach of contract

13   arguments. Dkt. 42 at 19. Safeco counters that it "acted reasonably in denying the claim

14   in light of plaintiff's admitted refusal to cooperate in the investigation of an obviously

15   suspicious claim." Dkt. 52 at 10. If the factfinder determines that Safeco's investigation

16   of the vandalism claim was unreasonable, the denial of the vandalism claim could also be

17   unreasonable. Thus, the Court denies summary judgment as to the vandalism claim as a

18   violation of the IFCA as well.

19       **3.    Bad Faith**

20       In Washington, an insurer has a duty of good faith to its policyholder. *Smith v.*

21   *Safeco Ins. Co.*, 150 Wn.2d 478, 484 (2003). "An action for bad faith handling of an

22   insurance claim sounds in tort." *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 389

(1992). "Claims of insurer bad faith are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." *Mut. of Enumclaw*, 161 Wn.2d at 916 (internal quotation marks omitted).

To prove that the insurer acted in bad faith, the insured must show that the insurer's breach was "unreasonable, frivolous, or unfounded." *Smith*, 150 Wn.2d at 484 (citing *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 433 (2002))*.* "Whether an insurer acted in bad faith is a question of fact." *Id.* (citing *Van Noy v. State Farm Mut. Auto Ins. Co.*, 142 Wn.2d 784, 796 (2001)). For a question of bad faith to be resolved on summary judgment, "there must be no disputed facts pertaining to the reasonableness of the insurer's actions in light of all the facts and circumstances of the case." *Id.* at 486. "[A]n insured may maintain an action against its insurer for bad faith investigation of the insured's claim and violation of the CPA regardless of whether the insurer was ultimately correct in determining that coverage did not exist." *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn.2d 269, 279 (1998) (en banc).

Safeco argues that Pisha's bad faith allegations "devolve into two primary contentions, 1) the investigation into the cause and origin of the fire was unreasonably delayed, and 2) EUOs were requested not to investigate the claim, but to provide justification for Safeco to persecute [Pisha] and 'pressure' him." Dkt. 52 at 10–11. Regarding the fire investigation, Pisha's framing is that Safeco acted in bad faith by using the EUO to delay his claim and to put pressure on him, "intentionally delay[ing] the completion of the C&O investigation until it had Pisha's tax returns, bank records, financial records, cell phone records, cell tower records, and an EUO." Dkt. 42 at 8, 20.

1   Pisha emphasizes that in the transcript of the EUO on the fire "[o]f the 200 pages, 190

2   pages were dedicated to issues other than the cause of the fire or reasons the claim was

3   referred to SIU," so "[a]n assertion that the EUO was required, reasonable, or the reason

4   for delay of the C&O is clearly false." Dkt. 42 at 8. He argues that the C&O experts had

5   all information necessary for their final determination by the end of December 2014, and

6   in unreasonably delaying that determination and treating Pisha as under investigation for

7   arson, Safeco "was clearly looking out for its own interests" and violated multiple

8   provisions of the WAC. *Id.* at 20–21.

9       Safeco argues that there is no admissible evidence before the Court that it

10  unreasonably delayed the C&O investigation or that Safeco sought the EUO related to the

11  fire investigation for any reason other than to investigate the claim. Dkt. 52 at 11. There

12  is evidence in the record supporting Safeco's argument that the delay in conducting the

13  EUO was substantially caused by a lack of responsiveness from Pisha's representatives,

14  as well as the time it took to gather the requested records and Pisha's travel schedule.

15  Safeco is also correct that after the EUO was conducted, it concluded the investigation,

16  accepted coverage, and paid the actual cash value of the home relatively promptly. Dkt.

17  35-1 at 21.

18      However, there is also some evidence in the record supporting Pisha's position,

19  which is in essence that as the forensic investigation could not rule out an electrical cause

20  for the fire, it was unreasonable for Safeco not to ask the C&O investigators to complete

21  their work in December 2014 or January 2014 and subsequently conclude that an EUO

22  was unnecessary as an accidental cause could not be forensically excluded. Given Van

1  De Wage's testimony that the staple in the wire was "a very bad ignition source," Dkt. 47

2  at 82, and Safeco's articulated reasons for seeking an EUO, Dkt. 35-3, Ex. 5 at 73; Dkt.

3  48 at 9, 14, a reasonable juror could conclude Safeco's insistence on additional

4  information through extensive records collection and an EUO was reasonable based on

5  the information available at the time and under the policy even if the C&O investigation

6  had concluded shortly after the fire. *See Pilgrim*, 89 Wn. App. at 720. However, the

7  Court is unable to conclude that no reasonable juror could find Pisha's framing of the

8  investigation more persuasive. *Matsushita*, 475 U.S. at 586.

9         Additionally, Safeco argues that Pisha has failed to submit admissible evidence of

10  harm stemming from its alleged bad faith. Dkt. 52 at 11, 12. Safeco argues that it "was

11  justified in seeking an EUO from plaintiff given the objective facts involved in both

12  claims," and argues it first learned of Pisha's mental health concerns in February 2017,

13  "more than a year after Safeco accepted and paid all fire related claims." *Id.* at 12.

14  However, Pisha attributes mental health problems to Safeco's handling of both EUOs and

15  some evidence in the record supports this attribution. Regarding the fire-specific EUO,

16  the record shows Thomas emailed Pratt on October 14, 2015, stating in part that Pisha

17  has had health issues during the claim investigation process and "is currently under the

18  care of a physiologist and his mental issues have been attributed to stress from the

19  treatment he has received from your company on this claim. . . . He indicates that the

20  treatment by your attorney in the EUO's has been a primary source of his mental issues."

21  Dkt. 35-7, Ex. 47 at 19. Similarly, Pisha declares that based on Safeco's handling of the

22  fire claim, he "believed that Safeco was attempting to set me up to deny my claim,

1    pressuring me with clear allegations of arson. This caused me significant anxiety and

2    health problems . . . ." Dkt. 44, ⁋ 25. Regarding the vandalism and personal property

3    EUO in February 2017, as noted Pisha declares that he suffered an anxiety attack and was

4    medically advised not to submit to another EUO but despite this, Safeco refused to accept

5    his offer of written responses under penalty of perjury. *Id.* ⁋⁋ 61–62; *see also* Dkt. 35-9,

6    Ex. 62 at 20. Safeco fails to establish that injury to mental health cannot constitute a bad

7    faith harm. Additionally, the Court has found questions of fact as to whether Safeco

8    unreasonably insisted on an EUO as to the vandalism claim and personal property claim

9    despite Pisha's mental health problems and offer to submit written responses and then

10   improperly denied those claims based on its arguably unreasonable investigation. These

11   deprivations of benefits owed could also constitute harm from bad faith investigation

12   practices. Thus for the reasons discussed, the Court denies summary judgment as to the

13   bad faith claim.

14       **4.    Violation of the CPA**

15       A Washington CPA claim requires a showing of (1) an unfair or deceptive

16   practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes

17   injury to the party in his or her business or property, and (5) which injury is linked to the

18   unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,

19   105 Wn.2d 778, 784–85 (1986). "Violation of an insurance regulation is an unfair trade

20   practice, which may result in CPA liability if the remaining elements of the five-party test

21   are established." *Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co.*, 150 Wn. App.

22   1, 12 (2009) (citing *Indus. Indem. Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907,

923 (1990)).  "[B]ad faith constitutes a per se violation of the CPA." *Wellman & Zuck,*

*Inc. v. Hartford Fire Ins. Co.*, 170 Wn. App. 666, 678 (2012) (quoting *Ledcor*, 150 Wn.

App. at 12); *see also* RCW 48.01.030; *RSUI Indem. Co., Inc. v. Vision One, LLC*, No.

C08–1386RSL, 2009 WL 5125420, at *3 (W.D. Wash. Dec. 18, 2009) ("Bad faith

constitutes a per se violation of the CPA, so the Court will not separately analyze the

CPA claim.").

Personal injuries are not compensable under the CPA. *Panag v. Farmers Ins. Co.*

*of Wash.*, 166 Wn.2d 27, 57 (2009) (en banc). "However, the injury requirement is met

upon proof the plaintiff's 'property interest or money is diminished because of the

unlawful conduct even if the expenses caused by the statutory violation are minimal.'" *Id.*

(quoting *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854 (1990)). Even temporary

loss of use of property or "[p]ecuniary losses occasioned by inconvenience" may

constitute sufficient injury. *Id.* at 57–58.

As bad faith constitutes a per se violation of the CPA, and the Court found

disputes of material fact as to multiple bases for Pisha's bad faith claim, Safeco's

argument that Pisha has "failed to set forth any facts supporting his claim that Safeco

engaged in an unfair business practice," Dkt. 52 at 10, is without merit. Safeco also

argues that Pisha has failed to set forth "admissible evidence in opposition to Safeco's

motion of an injury to business or property, a required element of a CPA claim. Dkt. 52 at

10. However, Pisha alleges specific underpayment of his personal property claim, and the

vandalism claim alleges an outright denial, both of which are supported by evidence in

1   the record and are cognizable injuries to property. Therefore, the Court denies summary

2   judgment on Pisha's CPA claim.

3                                        **IV.   ORDER**

4          Therefore, it is hereby **ORDERED** that Safeco's motion for summary judgment,

5   Dkt. 32, is **GRANTED in part** and **DENIED in part** as stated herein.

6          Dated this 29th day of April, 2020.

7

8                                        _____

9                                        BENJAMIN H. SETTLE
                                         United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 39